*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

KELLY LYNN BALLINGER,

Defendant-Appellant.

UNPUBLISHED
February 18, 2020

No. 344038
Kalamazoo Circuit Court
LC No. 2017-001013-FC

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

MATTHEW RYAN LONGENECKER,

Defendant-Appellant.

No. 344444
Kalamazoo Circuit Court
LC No. 2017-001014-FC

Before: SAWYER, P.J., and MARKEY and STEPHENS, JJ.

PER CURIAM.

In Docket No. 344038, defendant, Kelly Lynn Ballinger, appeals by right her jury convictions of involuntary manslaughter, MCL 750.321, first-degree child abuse, MCL 750.136b(2), and possession of methamphetamine, MCL 333.7403(2)(b)(*i*). The trial court sentenced Ballinger to serve 5 to 15 years in prison for the manslaughter conviction, 285 months to 50 years in prison for the first-degree child abuse conviction, which represented an upward departure from the sentencing guidelines, and 295 days for the methamphetamine conviction.

In Docket No. 344444, defendant, Matthew Ryan Longenecker, appeals by right his jury convictions of murder committed in the perpetration of first-degree child abuse (felony murder), MCL 750.316(1)(b), first-degree child abuse, and possession of methamphetamine. The trial court sentenced Longenecker to serve life in prison without the possibility of parole for the murder

-1-

conviction, 285 months to 50 years in prison for the first-degree child abuse conviction, and 302 days for the methamphetamine conviction.

On appeal, both Ballinger and Longenecker argue that there was insufficient evidence to establish the intent element of first-degree child abuse. Ballinger also argues that her departure sentence for first-degree child abuse was not reasonable. Longenecker additionally argues that the trial court and prosecutor made errors that deprived him of a fair trial and that he could not constitutionally be convicted of both felony murder and first-degree child abuse. For the reasons more fully explained below, we conclude that there were no errors and affirm.

## I. BASIC FACTS

Defendants' convictions arose from the death of Ballinger's four-year-old daughter, DT, in the early morning hours of July 9, 2017. Longenecker, who was not DT's father, was Ballinger's live-in-boyfriend at the time. The evidence showed that DT had suffered numerous injuries from blunt force trauma before her death. On the night at issue, her head had been covered; she had been tightly wrapped in blankets, and taped. There was evidence that she aspirated vomit, asphyxiated, and died. The evidence regarding the level of abuse perpetrated against DT was horrific.

The trial court held a joint trial with separate juries. Both Ballinger and Longenecker argued at trial that they did not intend to harm DT and that they did not know that she was likely to suffer harm from being tightly wrapped in blankets. Longenecker's jury rejected his argument and found him guilty as charged. Ballinger's jury agreed that she was not guilty of felony murder, but found her guilty of involuntary manslaughter. Ballinger's jury also found her guilty as charged on the remaining offenses. Both defendants now appeal.

## II. SUFFICIENCY OF THE EVIDENCE

### A. STANDARD OF REVIEW AND GOVERNING PRINCIPLES

We first address defendants' challenges to the sufficiency of the evidence in support of their convictions for first-degree child abuse.[1] This Court reviews de novo the issue regarding whether there was sufficient evidence to support a conviction. *People v Lueth*, 253 Mich App 670, 680; 660 NW2d 322 (2002). In reviewing the sufficiency of the evidence, this Court must view the evidence—whether direct or circumstantial—in a light most favorable to the prosecutor and determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. *People v Reese*, 491 Mich 127, 139; 815 NW2d 85 (2012); *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002). A jury, and not an appellate court, observes the witnesses and listens to their testimony; therefore, an appellate court must not

---

[1] Ballinger couches her argument in the form of a challenge to the trial court's ruling denying her motion for a directed verdict. Review of a court's decision on a motion for directed verdict is by the same standard as a challenge to the sufficiency of the evidence, except that only evidence admitted up to the time of the motion is considered. *People v Powell*, 278 Mich App 318, 320 n 1; 750 NW2d 607 (2008).

interfere with the jury's role in assessing the weight of the evidence and the credibility of the witnesses. *People v Wolfe*, 440 Mich 508, 514-515; 489 NW2d 748 (1992). Circumstantial evidence and any reasonable inferences that arise from such evidence can constitute satisfactory proof of the elements of a crime. *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999). The prosecution need not negate every reasonable theory of innocence, but need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant. *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). "All conflicts in the evidence must be resolved in favor of the prosecution." *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008).

## B. BALLINGER'S CHALLENGE

On appeal, Ballinger contests whether the prosecutor presented sufficient evidence to establish that she knowingly or intentionally caused serious physical harm to DT. To convict a person of first-degree child abuse, the prosecution must prove, in relevant part, that the perpetrator "knowingly or intentionally cause[d] serious physical or serious mental harm to a child," MCL 750.136b(2), or aided and abetted another in causing serious physical or mental harm to a child, MCL 767.39. See *People v Robinson*, 475 Mich 1, 15; 715 NW2d 44 (2006) (stating that a person can be held liable as an aider and abettor of any crime that the defendant specifically intended to aid or abet, or any crime that he or she had knowledge of, as well as those crimes that are the natural and probable consequence of the offense that he or she intended to aid or abet). "Because the Legislature provided that the perpetrator must 'knowingly or intentionally' cause the serious physical harm, it is not sufficient for the prosecution to prove that a defendant intended to commit the act that caused the physical harm; the prosecution must prove that the 'defendant intended to cause serious physical harm or knew that serious physical harm would be caused by [his or] her act.' " *People v McFarlane*, 325 Mich App 507, 513-514; 926 NW2d 339 (2018) (alteration in original), quoting *People v Maynor*, 470 Mich 289, 291; 683 NW2d 565 (2004). "[T]he prosecution may rely on minimal circumstantial evidence to prove that the defendant had the required mental state." *McFarlane*, 325 Mich App at 516. Moreover, knowledge includes actual and constructive knowledge. See *People v Gould*, 225 Mich App 79, 87; 570 NW2d 140 (1997). As such, a reasonable jury can infer from the nature of the act itself—such as the violence of the act—that the perpetrator must have intended to cause serious physical harm or knew that serious physical harm would likely result. *McFarlane*, 325 Mich App at 516-517.

In this case, Ballinger's jury watched a video of her making statements to police officers in which she described how she and Longenecker had been disciplining DT over the past few weeks. The jury also saw messages in which Longenecker insisted that Ballinger use severe physical discipline with DT because he believed that DT was "evil" and posed a danger to the baby.[2] It was clear from Ballinger's statements to the police that she did not observe DT harming the baby. Instead, the evidence showed that it was Longenecker who instigated the idea that DT was a four-year-old psychopath who deserved extreme and cruel punishment to correct her purported behavior. Ballinger did claim that DT admitted to harming the baby, but the totality of

---

[2] The "baby" is Longenecker's child with Ballinger.

the circumstances suggested that Longenecker had targeted DT for violence and that Ballinger chose to go along with his plan, even if somewhat reluctantly.

The jury learned that DT had suffered injuries to her face and head. Although Ballinger told officers that DT inflicted those injuries on herself, the jury saw text messages that indicated that Longenecker and Ballinger were physically abusing DT. Indeed, the jury saw numerous text messages in which Longenecker insisted that Ballinger violently punish DT. He stated that she should beat DT and threaten to smash her teeth out. And Ballinger acquiesced to his demands; she wrote in one text message that she wanted to hit DT some more but her hand hurt.

In a different set of messages, Longenecker mentioned the wound to DT's head, which he claimed she inflicted on herself. The pathologist described the wound as a "gaping laceration" and opined that it would have required medical treatment to heal properly. He also stated that DT's blunt force injuries were not consistent with normal wear and tear. A reasonable jury considering this evidence could infer that it was very unlikely that a four-year old would have inflicted such an injury on herself. Considering the evidence that Longecker was caring for DT at the time and that he believed that DT was "evil" and deserving of severe physical punishment, the jury could reasonably have concluded that he inflicted the injury as a form of punishment.

Additionally, the jury heard and saw evidence that Ballinger refused to get medical attention for DT's gaping wound and took steps to prevent others from discovering that DT was being physically abused. Ballinger acknowledged in text messages that she knew that Longenecker had been injuring DT and did not take any steps to stop him. Instead, she asked him to stop inflicting the injuries. On another occasion, Ballinger pointed out the implausibility of Longenecker's explanations for DT's injuries by noting that DT would have had to have fallen out of bed quite often to have suffered the injuries that she had. Ballinger further agreed that they had been forcing DT to wear a diaper, ostensibly because she was not wiping herself well enough. Ballinger even stated that she had been violent with DT: She admitted to grabbing the child by her hair with both hands and swinging her to the ground where DT may have hit a rock or other hard surface. Other text messages suggested that Ballinger physically struck DT. Moreover, Longenecker's mother testified that she had seen Ballinger slap and spank the children and observed injuries on DT. Longenecker's mother did not do anything because her son and Ballinger always had an explanation for the injuries. The totality of the evidence permitted a conclusion that Ballinger was a willing participant in Longenecker's plan to humiliate and abuse DT.

Ballinger also admitted that she and Longenecker had been working together to wrap DT in blankets—like a mummy—and then secure her in the blankets with tape. She stated that Longenecker sometimes covered DT's face with a blanket or other things to "get the devil out" or make her "scream and shit." The jury saw that Ballinger told officers that DT's screams would sometimes keep the other children up at night. The jury also read text messages in which Longenecker bragged to Ballinger that his method of wrapping DT in tape was "genius" because the more she struggled to move, the tighter the wrap would get. It is within common knowledge that children can be suffocated if improperly restrained or if the child's airways are obstructed. See *Gould*, 225 Mich App at 87 (recognizing that a prosecutor can prove an actor's intent through evidence that suggests that the defendant had constructive knowledge of the harm that might be caused by his or her actions). This evidence showed that Ballinger knowingly and willingly

participated in the wrapping, knew that DT was dangerously restrained on those occasions, and knew that it terrified the child and caused her to scream.

Moreover, the evidence from the night of DT's death permitted findings that DT was in particular danger and that Ballinger knew about the danger. Ballinger agreed that she was home and that she helped Longenecker wrap the child. She told officers that she saw DT vomit while being wrapped. Ballinger admitted that DT pleaded with her for help, but Ballinger refused to assist her. Ballinger also told officers that she heard DT making an odd noise later that night and that she again did not help the child. It was Ballinger who later discovered DT when she was already "stiff as hell."

Finally, the jury heard from the pathologist that DT had numerous physical injuries, which included the gaping wound to her head, and that she had vomited and aspirated some of the vomit. The pathologist opined that DT died from a combination of factors, including asphyxiation and physical injuries. He also stated that hyperthermia—high body temperature—may have played a role in her death because hyperthermia would have raised the child's heart and respiration rates. The pathologist noted that asphyxiation can occur from an obstruction in the airways and/or as a result of constriction of the torso. He noted too that DT had a torn frenulum, which is indicative of suffocation because a person will frequently shake their head violently in an attempt to clear an obstruction.

This evidence permitted findings that Ballinger intentionally participated in the wrapping of DT. She also knew that her head was likely covered, that DT had vomited, that she was suffering from physical injuries, and that she was distraught. A reasonable jury could find that Ballinger had constructive knowledge that wrapping a child in layers of blankets on a warm summer night, taping her torso, and covering her head—especially under circumstances in which the child may be ill or nauseous from other physical injuries—posed a significant danger of serious physical harm. From the evidence that Ballinger ignored all the signs that DT was in physical danger, the jury could further infer that she intended to cause serious physical harm to her or knew that the likely result of her actions would be to cause serious physical harm to the child. See *McFarlane*, 325 Mich App at 516 (noting that only minimal circumstantial evidence is necessary to prove intent). Moreover, even if Ballinger did not herself intend to cause serious physical harm to DT through her actions, the evidence from the text messages strongly indicated that Longenecker intended to cause DT serious physical harm or acted with the knowledge that serious physical harm might result and that Ballinger aided and abetted his efforts despite knowing his intent. See *Robinson*, 475 Mich at 15. As such, the prosecution presented sufficient evidence to allow a reasonable finder of fact to conclude that Ballinger had the requisite intent to commit first-degree child abuse, or aided and abetted someone who had the requisite intent. There was sufficient evidence to support the jury's verdict that Ballinger committed first-degree child abuse.

C. LONGENECKER'S CHALLENGE

Similar to Ballinger, Longenecker argues on appeal that the prosecution failed to present sufficient evidence from which a reasonable jury could find that he intended to cause serious physical harm to DT or knew that serious physical harm would result from his actions. Although he argues that this Court should vacate his conviction of felony murder, he does not contest the elements of murder. Rather, he maintains that this Court must vacate that conviction along with

the first-degree child abuse conviction because the felony murder conviction was predicated on the commission of first-degree child abuse. See MCL 750.316(1)(b) (stating that first-degree murder is, in relevant part, murder committed in the perpetration of first-degree child abuse). As already discussed, to convict someone of first-degree child abuse, the prosecution must prove, in pertinent part, that the perpetrator "knowingly or intentionally cause[d] serious physical or serious mental harm to a child." MCL 750.136b(2).

In Longenecker's case, the prosecution presented ample evidence from which a reasonable jury could infer that Longenecker intended to inflict serious physical harm on DT or, at the very least, knew that his actions were likely to cause her serious physical harm. As already related, the pathologist testified that DT suffered various physical injuries—including a gaping cut to her head, numerous bruises, and a severe blow to the back of her head. Although there was evidence that Ballinger may have caused some of these injuries, there was also evidence—when considered in the light most favorable to the prosecution—that Longenecker caused some of the injuries, including the more serious head injuries.

The evidence from the text messages showed that Longenecker not only encouraged Ballinger to batter DT, he demanded that she do so. Indeed, at one point he told Ballinger that she needed to drag DT out of bed, throw her into the kitchen, and beat her ass. In that same series of messages, Longenecker told Ballinger that if DT cried, Ballinger should warn DT to stop crying, or she would punch her in the face and bust out her teeth. Longenecker felt that such physical abuse was warranted for a preschool-aged child because the preschooler had engaged in "evil shit."

Although the text messages suggested that Longenecker harbored an irrational hatred for the four-year-old child, even to the point of calling her evil, a monster, and possessed, in his statement to officers, Longenecker claimed to love her and said that it was Ballinger who thought that DT was possessed by the devil. Likewise, even though he repeatedly encouraged Ballinger to abuse DT in his messages, in his statement to police, Longenecker claimed to be a reluctant participant and blamed Ballinger for forcing him to physically discipline DT. The messages, however, showed that Ballinger was not home when DT suffered the gash to her head. In fact, Longenecker sent a message to Ballinger while she was working and informed her of the injury. He stated that DT went crazy and bashed her own head.

Longenecker's statements to the officers and his excuses and explanations for the injuries that DT suffered were so implausible that a reasonable jury could find that he lied about how she came to have the injuries. See *People v Bailey*, 310 Mich App 703, 714; 873 NW2d 855 (2015) (stating that it is for the jury to decide the weight and credibility to be afforded the evidence and warning that the Court would not interfere with the jury's role as the sole judge of the facts). A reasonable jury could also conclude that Longenecker lied about his treatment of DT in order to cast himself in the least culpable role. The jury could further infer that he lied about the injuries because he inflicted them. From that, a reasonable jury examining Longenecker's statements to police officers and considering those statements in light of the messages that he sent to Ballinger could plainly and easily find that Longenecker was the driving force behind the extreme physical discipline inflicted on DT. See *Hardiman*, 466 Mich at 428.

There was also evidence that Longenecker encouraged Ballinger to cover up the abuse by keeping DT from participating in outside events and that he additionally encouraged Ballinger to

convince DT to tell others that her injuries were self-inflicted. The evidence that Longenecker used and encouraged extreme physical abuse when disciplining DT was indicative of his intent to cause serious physical harm when disciplining DT. See *McFarlane*, 325 Mich App at 516 (noting that intent can be inferred from minimal circumstantial evidence). The fact that DT had suffered a severe head injury—a gaping wound that would not heal properly without medical intervention— also suggested that Longenecker knew that his extreme physical discipline was likely to cause serious physical harm. *Id.* at 516-517 (stating that intent can be inferred from the nature of the act itself).

Longenecker also admitted to the police that he helped Ballinger wrap DT, which he stated included covering her face. Although Longenecker minimized his participation by claiming that he ensured that her airways were unobstructed and wrapped her less tightly, a reasonable jury could find that he was lying to the officers. From that, a reasonable jury could infer that he in fact wrapped DT tightly, which may have inhibited her ability to breathe freely, and covered her airways, which added further distress. Additionally, Longenecker himself told the officers that he was worried that DT might choke and informed Ballinger that she needed to check on DT frequently for that reason. He even went so far as to inform the officers that DT complained of nausea and that he responded by pleading with her not to vomit. He explained that he was worried that she might choke. The jury could reasonably reject Longenecker's concern for DT's welfare as feigned but nevertheless accept this statement as proof that he knew that DT might choke on her own vomit or otherwise suffocate while restrained and covered.

This evidence was sufficient to establish that Longenecker intended to cause serious physical harm to DT when he wrapped her tightly in tape, left her immobilized on her back in bed while suffering from nausea, and then covered her airways. Indeed, a reasonable jury could infer that he intended to kill her or acted with such contempt for the likelihood that she would die that it amounted to the malice necessary to prove murder. See *People v Aaron*, 409 Mich 672, 728-729; 299 NW2d 304 (1980). The prosecutor presented sufficient evidence to support Longenecker's convictions of first-degree child abuse and felony murder.

## III. BALLINGER'S SENTENCING CHALLENGE

### A. STANDARDS OF REVIEW AND GOVERNING PRINCIPLES

In addition to her challenge to the sufficiency of the evidence, Ballinger argues on appeal that the trial court abused its discretion when it sentenced her to serve a minimum of 285 months in prison for her conviction of first-degree child abuse. The top end of the minimum sentence guidelines range for the offense was scored at 225 months; consequently, the trial court exceeded the guidelines range by 60 months or five years.

We review for reasonableness "[a] sentence that departs from the applicable guidelines range." *People v Lockridge*, 498 Mich 358, 392; 870 NW2d 502 (2015). In *People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017), our Supreme Court provided elaboration on the "reasonableness" standard, stating:

> [T]he proper inquiry when reviewing a sentence for reasonableness is
> whether the trial court abused its discretion by violating the "principle of

-7-

proportionality" set forth in *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990), "which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender."

Factual findings related to a departure must be supported by a preponderance of the evidence and are reviewed for clear error. *People v Lawhorn*, 320 Mich App 194, 208-209; 907 NW2d 832 (2017). For purposes of sentencing, "a court may consider all record evidence, including the contents of a PSIR,[3] plea admissions, and testimony presented at a preliminary examination." *People v McChester*, 310 Mich App 354, 358; 873 NW2d 646 (2015).

The key test is not whether a sentence departs from or adheres to the guidelines range, but whether the sentence is proportionate to the seriousness of the matter. *Steanhouse*, 500 Mich at 472. "The premise of our system of criminal justice is that, everything else being equal, the more egregious the offense, and the more recidivist the criminal, the greater the punishment." *People v Babcock*, 469 Mich 247, 263; 666 NW2d 231 (2003). Sentencing judges are "entitled to depart from the guidelines if the recommended ranges are considered an inadequate reflection of the proportional seriousness of the matter at hand." *Milbourn*, 435 Mich at 661. A sentence within the guidelines might be disproportionality lenient. *Id.* "Where a defendant's actions are so egregious that standard guidelines scoring methods simply fail to reflect their severity, an upward departure from the guidelines range may be warranted." *People v Granderson*, 212 Mich App 673, 680; 538 NW2d 471 (1995). In *People v Steanhouse*, 313 Mich App 1, 46; 880 NW2d 297 (2015), aff'd in part, rev'd in part on other grounds 500 Mich 453 (2017), this Court indicated:

> Factors previously considered by Michigan courts under the proportionality standard included, among others, (1) the seriousness of the offense; (2) factors that were inadequately considered by the guidelines; and (3) factors not considered by the guidelines, such as the relationship between the victim and the aggressor, the defendant's misconduct while in custody, the defendant's expressions of remorse, and the defendant's potential for rehabilitation. [Citations omitted.]

"[A] trial court must justify the sentence imposed in order to facilitate appellate review, which includes an explanation of why the sentence imposed is more proportionate to the offense and the offender than a different sentence would have been." *People v Dixon-Bey*, 321 Mich App 490, 525; 909 NW2d 458 (2017) (quotation marks and citations omitted). When making a decision to depart from the advisory guidelines range, a trial court must sufficiently articulate the reasons or justification for the departure. See *Steanhouse*, 500 Mich at 470.

We note that recently our Supreme Court held "that due process bars sentencing courts from finding by a preponderance of the evidence that a defendant engaged in conduct of which he was acquitted." *People v Beck*, __ Mich __, __; __ NW2d __ (2019); slip op at 22. In *People v Smith*, 482 Mich 292, 309; 754 NW2d 284 (2008), the Supreme Court made the following observations regarding sentencing departures:

---

[3] PSIR stands for presentence investigation report.

A comparison of defendant's sentences to the sentences recommended for other offenders who committed the same type of crime suggests that defendant's sentences might be disproportionate. Although the atrocity of any criminal sexual conduct offense is not to be minimized, proportionality is still judged by weighing both the nature of the offense and the offender's criminal history. Given the fact that defendant had no criminal history, the 30–year minimum sentence imposed for each conviction might be a disproportionate departure.

Certainly, a trial court that is contemplating a departure is not required to consider where a defendant's sentence falls in the sentencing range grid. However, we think that reference to the grid can be helpful, because it provides objective factual guideposts that can assist sentencing courts in ensuring that the offenders with similar offense and offender characteristics receive substantially similar sentences. [Quotation marks and citations omitted.]

## B. DISCUSSION

The trial court in this case carefully listed the factors that went into its decision to sentence Ballinger to serve 285 months to 50 years in prison for her conviction of first-degree child abuse. In particular, the trial court recognized the "appalling and gruesome details demonstrating the abuse and ultimate death of [Ballinger's] four-year-old child." The court stated that the jury heard that DT died after "extended and repeated physical and psychological abuse perpetrated over a number of weeks." The court found it particularly noteworthy that Ballinger passed by DT's room and heard her making "unusual gurgling and murmuring sounds underneath [her] confinement and . . . [did] nothing, absolutely nothing." The court opined that it was a "horrific, dreadful way to die for this poor young girl" and that it was especially troubling that Ballinger did nothing to stop the brutality. The court believed that Ballinger's indifference to her daughter's welfare was exemplified by her efforts to hide her methamphetamine use from officers at the very moment when first responders were trying to care for her child.

The trial court acknowledged that it had discretion to choose an appropriate sentence. The court stated that its goal was to select a reasonable sentence that was proportionate to the offender and offense, and it recognized that the sentencing guidelines ordinarily reflect a reasonable sentence range. The court opined, however, that the sentencing guidelines did not adequately address the nature of the offense and the circumstances surrounding Ballinger as the offender.

The trial court found that Ballinger had not accepted responsibility for her role in DT's death and did not express any true remorse. The court further found that Ballinger participated in and helped Longenecker abuse DT. The guidelines, the court stated, did not take into consideration the brutality of the abuse. Additionally, the trial court noted that because the levels for the offense variables (OVs) reach a maximum at 100 points, the guidelines did not adequately reflect the fact that Ballinger had 160 points scored under the OVs.[4] The court explained that the OV levels increase every 20 points and that, as to Ballinger, 60 points were unaccounted for under the

---

[4] First-degree child abuse is a Class A offense, MCL 777.16g, and with respect to Class A crimes the top OV level is OV level VI, which encompasses scores of 100+ points, MCL 777.62.

guidelines. Therefore, the court decided to examine the sentencing grid and identify the next highest cell, which would be for an offender with the next highest level of prior record variables (PRVs). That cell, the court accurately stated, called for a minimum sentence of 171 to 285 months in prison. See MCL 777.62 (showing that the recommended minimum sentence range for an offender at OV level VI and PRV level C is 135 to 225 months and that for OV level VI and PRV level D it is 171 to 285 months). The court concluded that because the higher cell more accurately reflected the severity of the offense, it then selected the highest recommended minimum sentence for that cell—285 months in prison.

There was significant record evidence that Ballinger did not have any remorse for the actions that led to her daughter's death. Ballinger's videotaped statement to police officers permitted an inference that Ballinger was more concerned about her status and what others would think of her than with the harm she inflicted on DT. Furthermore, the author of the PSIR opined that Ballinger showed a lack of remorse, and the trial court was permitted to rely on that statement, see *McChester*, 310 Mich App at 358, in addition to its own observations of the evidence at trial and Ballinger's demeanor. Accordingly, the trial court did not clearly err when it found that Ballinger lacked remorse, and lack of remorse is a proper consideration in sentencing. *People v Houston*, 448 Mich 312, 323; 532 NW2d 508 (1995). Although the trial court stated that Ballinger had not taken responsibility for her role in the abuse, it does not appear that the court was improperly punishing Ballinger for failing to admit guilt. See *People v Pennington*, 323 Mich App 452, 467; 917 NW2d 720 (2018). Rather, the court was referring to the evidence that Ballinger abdicated any responsibility for protecting her daughter. And the evidence supported a finding that Ballinger not only failed to protect DT from Longenecker's abuse, she also accepted Longenecker's justification for it and encouraged or participated in it. This evidence also suggested that Ballinger's potential for rehabilitation is not great, which is another factor unaccounted for in the sentencing guidelines. *Steanhouse*, 313 Mich App at 46.

The trial court also correctly noted that the sentencing guidelines did not adequately reflect the brutality of the events leading to DT's death or the horrific circumstances of it. The evidence indicated that Ballinger and Longenecker in effect tortured DT—both physically and mentally—for days, if not weeks, before she died. The evidence also permitted an inference that DT struggled for some time before she died on the night at issue. The evidence that she had a torn frenulum suggested that she violently thrashed her head in an effort to avoid asphyxiation, and there was also testimony that she aspirated vomit. Ballinger herself told officers that DT screamed and cried. She additionally admitted that DT pleaded with her for help, but that she ignored her pleas. Although the evidence was not before Ballinger's jury, the trial court heard Longenecker's statement to police officers in which he stated that DT's mouth appeared to be filled with vomit or chunks, which suggested that she choked on her own vomit. The guidelines did not adequately take into consideration the mental and physical torment that DT suffered in her last moments, nor did they account for the horrifying indifference that Ballinger showed for her own daughter's welfare.

We hold that the trial court's decision to exceed the guidelines by sentencing Ballinger within the next highest available cell on the Class A grid fell within the range of reasonable and principled outcomes. The minimum prison sentence of 285 months was proportionate to the seriousness of the circumstances surrounding the offense and the offender.

## IV. EVIDENTIARY CLAIMS

### A. PRESERVATION AND STANDARDS OF REVIEW

We next address Longenecker's argument that the trial court should have precluded the pathologist from testifying about DT's earlier injuries and should not have admitted the copies of his text messages to Ballinger. Longenecker's position on appeal is that the evidence was improper other-acts evidence under MRE 404(b). Generally, we review for an abuse of discretion a trial court's decision to admit evidence. *People v Denson*, 500 Mich 385, 396; 902 NW2d 306 (2017). But whether a rule or statute precludes the admission of evidence is a preliminary question of law that this Court reviews de novo. *Id*. When a trial court admits evidence that is inadmissible as a matter of law, the court necessarily abuses its discretion. *Id*. Our review here, however, is for plain error affecting substantial rights because Longenecker never argued below that the evidence was inadmissible under MRE 404(b).

### B. ANALYSIS

Longenecker's MRE 404(b) argument is essentially that the evidence was inadmissible because the subject matter of the text messages concerned prior acts of child abuse and because the pathologist's testimony about earlier injuries necessarily disclosed prior acts of child abuse. Under standard MRE 404(b) analysis, Longenecker maintains that the evidence was admitted for an improper purpose, i.e., propensity, that the evidence was not relevant, and that the probative value of the evidence, if any, was substantially outweighed by the danger of unfair prejudice.

We initially question whether the text messages even constitute evidence of prior *acts* for purposes of MRE 404(b). See *People v Goddard*, 429 Mich 505, 518; 418 NW2d 881 (1988) ("Ken's statement, however, is just that—a statement, not a prior act. MRE 404(b) does not apply to a defendant's prior statements of intent."); *People v Rushlow*, 179 Mich App 172, 176; 445 NW2d 222 (1989) ("a prior statement does not constitute a prior bad act coming under MRE 404[b]"). We additionally question whether the pathologist's testimony describing DT's injuries constitutes evidence of prior acts under MRE 404(b).

Furthermore, Longenecker frames his argument entirely under MRE 404(b), but MCL 768.27b, which concerns acts of domestic violence, plainly applies. In MCL 768.27b(1), the Legislature provided that a person's acts of domestic violence are admissible "for any purpose for which it is relevant, if it is not otherwise excluded under [MRE 403]." An act of domestic violence includes causing or attempting to cause physical or mental harm to a family or household member. MCL 768.27b(6)(a)(*i*). It was undisputed that DT was a member of Longenecker's household. See MCL 768.27b(6)(b)(*ii*). As such, to the extent that the challenged evidence implicated Longenecker in acts of domestic violence against DT, we find that the evidence was admissible to prove his propensity to commit such acts. *People v Propp*, __ Mich App __, __; __ NW2d __ (2019); slip op at 14 (MCL 768.27b supersedes the prohibition against propensity evidence in MRE 404[b]); *People v Cameron*, 291 Mich App 599, 609-610; 806 NW2d 371 (2011); *People v Railer*, 288 Mich App 213, 219-220; 792 NW2d 776 (2010). This fatally undermines the premise of Longenecker's argument on appeal.

Moreover, the text messages were logically relevant, i.e., material and probative, establishing the following factual points: that Longenecker played an active role in disciplining DT; that he had a motive to harm her because of his claims that DT hurt the baby; that he advocated for extreme mental and physical punishment for DT; that he was the sole caregiver for DT when she incurred some of her injuries; that he worked together with Ballinger to restrain DT with blankets and tape, bragging how his technique caused the confinement to tighten when DT struggled; and that, ultimately, Longenecker intended to inflict serious physical and mental harm on DT. See MRE 401; MRE 402; *Denson*, 500 Mich at 400-401. The probative value of the text messages was quite high, and the probative value was certainly not substantially outweighed by the danger of unfair prejudice, especially considering that MCL 768.27b allowed for the evidence to be used to show propensity. MRE 403; *Denson*, 500 Mich at 398.[5] There was no error in admitting the text messages, plain or otherwise.

With respect to the pathologist's testimony and the extent that the testimony touched on injuries DT suffered before the day of her death, the evidence remained relevant to show that Longenecker knowingly or intentionally caused serious physical or mental harm to DT and to show malice relative to the felony murder charge. The testimony established a pattern of abuse that was intended to harm DT and that indeed produced injuries, making it more probable than without the evidence that Longenecker acted with the requisite malice and intent to harm at and around the time of DT's death. *Denson*, 500 Mich at 401-402. If our position is viewed as approving use of the evidence to show propensity, MCL 768.27b authorizes such use. *Propp*, __ Mich App at __; slip op at 14. Moreover, injuries DT suffered, whether incurred at the time of death or earlier but still identifiable, were all relevant to the pathologist's testimony and his ultimate opinion regarding the cause of death. See MRE 702 (expert opinion must be based on sufficient facts or data). The injuries had a bearing on causation and proving child abuse. And we cannot conclude that the probative value of the pathologist's testimony was substantially outweighed by the danger of unfair prejudice. MRE 403; *People v Watkins*, 491 Mich 450, 486-487; 818 NW2d 296 (2012). The trial court did not err by admitting the pathologist's testimony regarding all of DT's injuries.

## V. PROSECUTORIAL MISCONDUCT

### A. STANDARD OF REVIEW AND GUIDING PRINCIPLES

Longenecker also claims that the prosecutor committed misconduct that deprived him of a fair trial. Longenecker concedes that defense counsel did not object to the remarks at issue. Therefore, his claims of prosecutorial misconduct are unpreserved, and our review is for plain error

---

[5] "All evidence offered by the parties is 'prejudicial' to some extent, but the fear of prejudice does not generally render the evidence inadmissible." *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995). MRE 403 prohibits the admission of marginally probative evidence that will likely be given undue weight—that is, "evidence which is minimally damaging in logic will be weighed by the jurors substantially out of proportion to its logically damaging effect." *Id*. at 75-76 (quotation marks and citation omitted).

affecting substantial rights. *Carines*, 460 Mich at 763. In *People v Dobek*, 274 Mich App 58, 63-64; 732 NW2d 546 (2007), this Court observed:

> Given that a prosecutor's role and responsibility is to seek justice and not merely convict, the test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial. A defendant's opportunity for a fair trial can be jeopardized when the prosecutor interjects issues broader than the defendant's guilt or innocence. Issues of prosecutorial misconduct are decided case by case, and this Court must examine the entire record and evaluate a prosecutor's remarks in context. The propriety of a prosecutor's remarks depends on all the facts of the case. A prosecutor's comments are to be evaluated in light of defense arguments and the relationship the comments bear to the evidence admitted at trial. [Quotation marks and citations omitted.]

### B. ANALYSIS

Longenecker first complains that the prosecutor unfairly stated in his opening remarks that the evidence would show that Longenecker struck DT in the head when the evidence—in his view—showed that Ballinger was the one who struck DT in the head.

A prosecutor has the opportunity to state the facts that he or she intends to prove at trial during opening statements. *People v Johnson*, 187 Mich App 621, 626; 468 NW2d 307 (1991). And a prosecutor's statements about the facts to be proved at trial will not constitute error—even if no supporting evidence is presented at trial—as long as the prosecutor made the statements in good faith and they did not prejudice the defendant's trial. *People v Wolverton*, 227 Mich App 72, 75-76; 574 NW2d 703 (1997).

In his opening statement, the prosecutor remarked that the pathologist would talk about an injury to DT's head and that the evidence would show that the injury was the result of "being hit repeatedly and over the course of time in her head by him," referring to Longenecker.

During the trial, the pathologist described several injuries to DT's head that were consistent with multiple instances of blunt force trauma and inconsistent with normal "wear and tear." The injuries to her head included a soft spongy area that the pathologist first thought might be related to a skull fracture. After removing the skin, he determined that the spongy area was the result of considerable blunt force trauma. The injury had some old blood and possibly some new blood.

The evidence concerning DT's head injuries suggested that someone had forcefully struck her head on multiple occasions. In his opening remarks, the prosecutor indicated his belief that the evidence would show that Longenecker caused the head injury. And the prosecutor presented substantial evidence that this was in fact the case. The prosecutor presented text messages in which Longenecker expressed his anger at DT because he believed that she was an "evil" child who required extreme discipline to correct her behavior. The messages suggested that he not only exhorted Ballinger to violently discipline DT, but that he too had been striking her. Additionally, Longenecker confirmed in his interview with officers shortly after DT's death that he physically struck her. He told the police that on one occasion he jumped up and struck DT's head against a wall—even demonstrating the technique to the officers—while she was in a time-out. Although

he assured the officers that he struck her in a "non-lethal" sort of way, the demonstration was shocking and gave rise to an inference that he had caused a serious head injury. Given this evidence, it cannot be said that the prosecutor's challenged remarks amounted to a bad faith characterization of the evidence that he expected to present at trial.

Longenecker also faults the prosecutor for telling the jury in his closing argument that the evidence showed that Longenecker "[f]or unknown reasons wanted to punish" DT. More specifically, he argues that the undisputed evidence showed that Longenecker and Ballinger were actually disciplining DT for injuring the baby.

"The purpose of closing argument is to allow attorneys to comment on the evidence and to argue their theories of the law to the jury." *People v Finley*, 161 Mich App 1, 9; 410 NW2d 282 (1987). But, in presenting its closing argument, the prosecution may not argue facts that are not supported by the evidence admitted at trial, nor may the prosecutor mischaracterize the evidence. *People v Watson*, 245 Mich App 572, 588; 629 NW2d 411 (2001). "[T]he prosecutor may argue reasonable inferences from the evidence." *Id.*

Although Longenecker wrote in his text messages to Ballinger that DT wanted to kill or harm the baby, there was no evidence that DT had in fact ever harmed the child. Moreover, there was no evidence that Longenecker and Ballinger were incapable of protecting the baby without resorting to such extreme measures as wrapping DT in multiple layers and taping her body up like a mummy. Yet Longenecker's messages showed that he was obsessed with DT, describing her as evil and advocating the use of extreme mental and physical punishment. The nature of Longenecker's comments, when considered in conjunction with the evidence of DT's injuries, suggested that he acted out of some motivation other than a true fear that DT might harm the baby. As such, the prosecutor's comment was not outside the realm of fair commentary on the evidence. See *People v Flanagan*, 129 Mich App 786, 796; 342 NW2d 609 (1983) (noting that a prosecutor may, in his or her role as an advocate, make fair commentary on the evidence, which includes arguing the weight and credibility of the evidence).

Longenecker next argues that the prosecutor mischaracterized the evidence when he stated that the evidence showed that Longenecker knew that DT had vomited and then left the blanket over her head. In his closing argument, the prosecutor asserted that the evidence showed that Longenecker knew that his actions were likely to result in harm:

> But ask yourselves as a group of people with good common sense, the risk of harm to a four-year-old in a bed unable to move alone is great. How many things could happen? What would happen if there was a fire?

> They created a risk of harm to that child. And what elevated the risk of harm even greater? They knew, he knew she threw up. He knew she vomited.

> What raises it even higher now? After she vomited, they left the blanket on her face. And so it's summertime in Kalamazoo, it's hot, blanket's on her face. She can't move, she panics, she starts to breathe more and more. The blanket is going to start to absorb condensation, even less oxygen and air will get to her.

He created such a high risk of harm that any reasonable person could find that.

The prosecutor noted that Longenecker identified the blanket that was on DT's head. And the prosecution further pointed out that police officers found that blanket with tape on it. He suggested that Longenecker and Ballinger taped it over DT's head. The prosecutor maintained that this was consistent with the evidence that DT tore her frenulum while thrashing her head back and forth seeking air. In the prosecutor's view, the evidence showed that Longenecker had to have acted with more than gross negligence by wrapping DT's head, especially because he knew she vomited.

Although Longenecker never stated to the police that he knew DT vomited, a reasonable person viewing the evidence could conclude that he did know. Longenecker himself told the officers that DT said that she felt like vomiting, and he said that he urged her not to vomit. He also told the officers that he was so concerned that he told Ballinger to check on DT repeatedly. Moreover, Longenecker described finding vomit in DT's mouth after Ballinger discovered that DT was not breathing. There was also evidence of a stain on the bed where DT lay before her death that was consistent with vomit, and the pathologist testified that she had aspirated vomit.

A reasonable person viewing this evidence could find that Longenecker's statement to the officers was only partially true. The evidence that the bed was stained suggested that DT vomited before her head was covered. Because Longenecker admitted to covering DT's head, a reasonable person could conclude that he must have been aware that she vomited and yet he still covered her head. Consequently, the prosecutor's arguments about the inferences to be drawn from the evidence amounted to fair commentary on the evidence.

Longenecker has not identified any improper comments by the prosecution, let alone improper comments that prejudiced his trial. Because the prosecutor's remarks were proper commentary on the evidence, we also reject Longenecker's claim that defense counsel was ineffective for not objecting to the comments. Any objection would have been futile. *People v Snider*, 239 Mich App 393, 425; 608 NW2d 502 (2000).

## VI. DOUBLE JEOPARDY

### A. STANDARD OF REVIEW

For his final argument, Longenecker argues that his convictions of both first-degree child abuse and felony murder predicated on first-degree child abuse amounted to a violation of the constitutional prohibition against double jeopardy. This Court reviews a double jeopardy challenge de novo as a question of law. See *People v Ream*, 481 Mich 223, 226; 750 NW2d 536 (2008).

### B. ANALYSIS

The prohibition against double jeopardy does not permit, in relevant part, multiple punishments for the same offense. *Id.* at 227. In *Ream*, our Supreme Court held:

-15-

We conclude that convicting and sentencing a defendant for both first-degree felony murder and the predicate felony does not necessarily violate the "multiple punishments" strand of the Double Jeopardy Clause . . . . Because each of the offenses for which defendant was convicted, felony murder and first-degree criminal sexual conduct, contains an element that the other does not, they are not the "same offense" and, therefore, defendant may be punished for both. [*Id.* at 242.]

If an offense requires proof of a fact that the other offense does not, they are not the same offenses, and the defendant may properly be convicted of both crimes. *Id.* at 227-228.

"The elements of first-degree child abuse are (1) the person, (2) knowingly or intentionally, (3) causes serious physical or mental harm to a child." *Gould*, 225 Mich App at 87. A defendant commits felony murder when he or she commits murder during the perpetration or attempt to perpetrate certain enumerated offenses, including first-degree child abuse. MCL 750.316(1)(b). Because each of the offenses contains an element that the other does not, i.e., a killing and an act causing harm to a child, they are not the same offense. Therefore, Longenecker's convictions of both first-degree child abuse and felony murder predicated on first-degree child abuse do not violate double jeopardy.

## VII. CONCLUSION

Ballinger and Longenecker fail to identify any errors that warrant acquittal, a new trial, or resentencing.

We affirm.

/s/ David H. Sawyer
/s/ Jane E. Markey
/s/ Cynthia Diane Stephens

-16-